**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS E. CHANEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:11CV 183 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Thomas E. Chaney for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. <u>See</u> 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 19). Defendant filed a Brief in Support of the Answer. (Doc. No. 22).

**<u>Procedural History</u>**

On October 16, 2006, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on August 1, 2005. (Tr. 161-63). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated August 19, 2008. (Tr. 68, 77-85). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA). (Tr. 120). On April 30, 2010, the Appeals Council remanded the

case to an ALJ with instructions to obtain evidence from a vocational expert to clarify the effects of the assessed limitations on plaintiff's occupational base. (Tr. 86-88). On March 24, 2011, the ALJ determined that plaintiff could perform past relevant work and was, therefore, not disabled. (Tr. 17-25). On August 23, 2011, the Appeals Council denied plaintiff's request for review of the March 24, 2011 ALJ decision. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.  First ALJ Hearing

Plaintiff's first administrative hearing was held on April 30, 2008. (Tr. 28). Plaintiff was present and was represented by counsel. (Id.).

Plaintiff's attorney examined plaintiff, who testified that he was forty-six years of age and completed the ninth grade. (Tr. 29). Plaintiff stated that he did not obtain a GED. (Id.).

Plaintiff testified that he received a commercial driver's license ("CDL") to work as a truck driver, and that this was effective at the time of the hearing. (Id.). Plaintiff stated that he also received automobile related training, which he never used. (Id.).

Plaintiff testified that he had worked primarily as a truck driver in the past. (Tr. 30). Plaintiff stated that he worked as an over-the-road truck driver for approximately two weeks in 2007. (Id.). Plaintiff testified that he stopped working after two weeks because the long rides caused his back to hurt, and because the medication he was taking affected his ability to focus. (Id.).

Plaintiff testified that he has attempted to work at other jobs since December 2005 through a temp agency. (Tr. 31). Plaintiff stated that he worked a one-day job cleaning for a

contractor.  (Id.).  Plaintiff testified that he would not have been able to continue working at this position because the leaning and bending involved hurt his back and his shoulders.  (Id.).

Plaintiff stated that he underwent knee surgery in 2006.  (Tr. 32).  Plaintiff testified that he has not undergone any additional surgeries since December 2005.  (Id.).

Plaintiff stated that he is unable to work because his shoulders give out easily, his lower back hurts, and his left knee pops.  (Id.).

Plaintiff testified that, despite having undergone shoulder surgeries, he continues to experience sharp shoulder pain.  (Id.).  Plaintiff stated that he takes pain medication daily for his shoulder pain.  (Id.).

Plaintiff testified that he is unable to lift his arms above shoulder-level.  (Id.).  Plaintiff stated that he is also unable to hold his arms up for very long because they start to burn and ache. (Tr. 33).  Plaintiff testified that he is only able to lift about three gallons of gas with one hand. (Id.).  Plaintiff stated that he has difficulty reaching out in front.  (Id.).  Plaintiff testified that he is unable to lift a full sheet of plywood, which weighs twenty to twenty-five pounds.  (Tr. 34).

Plaintiff stated that he engaged in woodworking as a hobby.  (Id.).  Plaintiff testified that he has noticed difficulty using tools.  (Id.).  Plaintiff stated that his hands cramp and he has difficulty gripping.  (Id.).  Plaintiff testified that he has to stop using tools after about a half hour. (Id.).  Plaintiff stated that he is also unable to ride four-wheelers, hunt, fish, and water-ski due to his upper extremity problems.  (Tr. 35).

Plaintiff testified that he was not undergoing any treatment or therapy for his shoulder impairment at the time of the hearing.  (Id.).

Plaintiff stated that he experiences difficulty thinking clearly and lightheadedness due to

the medications he takes. (Id.). Plaintiff testified that he has difficulty focusing while driving. (Id.). Plaintiff stated that he also experiences problems carrying on a conversation. (Id.). Plaintiff testified that he has difficulty completing yard work due to achiness. (Tr. 36).

Plaintiff stated that he experiences sharp pain in his lower back. (Id.). Plaintiff testified that his back pain is constant, although it increases throughout the day as he moves. (Id.). Plaintiff stated that he sits in the recliner and takes medication to relieve his back pain. (Id.). Plaintiff testified that he sits in his recliner three to four times a day for periods of one hour to three hours. (Tr. 37). Plaintiff stated that pushing the vacuum increases his lower back pain. (Id.). Plaintiff testified that riding in a car for long distances, such as the 100 mile trip to the hearing, also increases his pain. (Id.). Plaintiff stated that he had to stop half-way to the hearing to get out and move around. (Id.).

Plaintiff testified that he is able to sit for about thirty minutes before he has to change positions due to back pain. (Tr. 38). Plaintiff stated that he moves around or sits and props his feet level with his waist to obtain relief. (Id.).

Plaintiff testified that he is able to walk for about ten minutes before he has to sit down. (Tr. 39).

Plaintiff stated that he lives with his wife, and that his mother-in-law lives in an apartment at the end of the house. (Id.).

Plaintiff testified that he routinely takes out the trash and occasionally vacuums. (Id.).

Plaintiff stated that his arm would "give out" if he held a cup of coffee in front of him for thirty minutes. (Tr. 40). Plaintiff explained that his arm would become achy, and he would have to put the cup down. (Id.).

Plaintiff stated that he splits the trash into two bags if it is heavy. (<u>Id.</u>). Plaintiff testified that he also has to stop halfway to take a break when taking the trash to the curb. (Tr. 41).

Plaintiff stated that he spends most of his day sitting in his recliner, napping, and watching television. (<u>Id.</u>). Plaintiff testified that, on a good day, he tries to do yard work. (<u>Id.</u>). Plaintiff stated that he mows, trims, and picks up sticks. (<u>Id.</u>). Plaintiff testified that his yard is about a half acre. (<u>Id.</u>). Plaintiff stated that he is able to mow his whole front yard without taking a break. (<u>Id.</u>). Plaintiff testified that he spends about thirty minutes at a time working on his yard. (<u>Id.</u>). Plaintiff stated that he is only able to trim for about five minutes at a time. (Tr. 42). Plaintiff testified that he operates the weedeater with both hands. (<u>Id.</u>). Plaintiff stated that his wife usually helps him with the trimming. (<u>Id.</u>).

Plaintiff testified that he had not hunted, fished, or done woodworking since his first surgery in 2004. (<u>Id.</u>). Plaintiff stated that he attends Church on Sundays and some Wednesdays. (<u>Id.</u>).

Plaintiff testified that he was receiving psychiatric treatment for depression at Family Counseling Center. (Tr. 43). Plaintiff stated that, as a result of the depression, he occasionally does not want to be around people, does not want to watch television, and has difficulty focusing (<u>Id.</u>). Plaintiff testified that he started taking medication for his depression, which made it somewhat easier to cope. (Tr. 44). Plaintiff stated that he has difficulty sleeping due to his depression. (Tr. 45). Plaintiff testified that his doctor prescribed sleeping medication. (<u>Id.</u>).

Plaintiff stated that he underwent knee surgery to repair a meniscal[1] tear. (<u>Id.</u>). Plaintiff

---

[1]The meniscus is a crescentic fibrocartilaginous structure of the knee. <u>Stedman's Medical Dictionary</u>, 1184 (28th Ed. 2006).

testified that the surgery was not successful and he continues to experience problems. (Id.). Plaintiff stated that his knee dislocates and he falls to the ground when he steps on uneven ground. (Id.). Plaintiff testified that he also has difficulty climbing ladders and stairs. (Id.). Plaintiff stated that he was no longer seeing a doctor for treatment of his knee. (Tr. 46). Plaintiff testified that he was told that he needed another surgery, and he was unable to afford the surgery. (Id.).

Plaintiff stated that he has no medical insurance. (Id.). Plaintiff testified that his wife works part-time. (Id.). Plaintiff stated that he receives $150.00 a month for collecting rent for an individual. (Id.). Plaintiff testified that this involves knocking on the tenant's door and asking for the check, and then delivering the check to the landlord. (Id.).

## B. Second ALJ Hearing

Plaintiff's second ALJ hearing was held on September 15, 2010. (Tr. 50). Plaintiff was present and was represented by counsel. (Id.).

The ALJ examined plaintiff, who testified that he was forty-seven years of age. (Tr. 51). Plaintiff stated that he was still experiencing problems related to his shoulder, back, and knee. (Tr. 52). Plaintiff testified that he experiences significant shoulder pain, even with medication. (Id.). Plaintiff stated that he was only able to lift his arms to shoulder-level. (Id.). Plaintiff testified that he was unable to pick up a gallon of milk without his elbow against his side. (Id.). Plaintiff stated that he has problems lifting when his arms are extended in front of him. (Id.).

Plaintiff testified that he has difficulty with both shoulders. (Id.). Plaintiff stated that he had undergone two surgeries on each shoulder. (Id.). Plaintiff testified that he underwent therapy and attended monthly doctors visits for medication for the past two years. (Id.).

Plaintiff stated that he takes Naproxen,[2] Tylenol, and Tramadol[3] for his pain. (Tr. 53). Plaintiff testified that he also uses a Lidoderm[4] patch. (Id.). Plaintiff stated that Dr. Yuli Soeter treats him for his pain. (Id.). Plaintiff testified that the pain medication helps somewhat but does not completely ease the pain. (Id.).

Plaintiff stated that he is able to engage in some activities when he takes his pain medication, but not for long periods. (Tr. 54). Plaintiff testified that yard work increases his shoulder pain. (Id.). Plaintiff stated that he is unable to trim because he cannot hold the weedeater up. (Id.). Plaintiff testified that he is able to mow the lawn using a riding lawnmower for periods of fifteen to twenty minutes, after which he has to rest for one to two hours before starting again. (Id.).

Plaintiff stated that Dr. Soeter recommended that he do shoulder exercises. (Tr. 55). Plaintiff testified that his shoulder pain increases if he does not do the exercises. (Id.).

Plaintiff stated that he was able to lift a can of soda comfortably with his elbows against his body. (Id.). Plaintiff testified that he was able to lift a box of groceries containing light items. (Id.).

Plaintiff stated that he was able to vacuum, but he could only do one room at a time.

---

[2]Naproxen is a non-steroidal anti-inflammatory drug indicated for the management of pain as well as for the treatment of arthritis. See Physician's Desk Reference (PDR), 2632-33 (63rd Ed. 2009).

[3]Tramadol is a centrally acting synthetic analgesic indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2429.

[4]Lidoderm is indicated for relief of pain associated with post-herpetic neuralgia, with its active ingredient being lidocaine. See PDR at 1114-1115.

(Id.).  Plaintiff testified that pushing the vacuum irritated his shoulder.  (Id.).

Plaintiff stated that he had to place the coffee pot on an end table so that he could pour the water into the pot without extending his shoulder.  (Tr. 56).  Plaintiff testified that he poured in ten cups of water.  (Id.).

Plaintiff stated that he underwent surgery on his left knee in February of 2010.  (Id.).  Plaintiff testified that the knee surgery went well, and his knee no longer popped out of the joint causing him to fall.  (Id.).

Plaintiff stated that he experiences back pain when he walks long distances.  (Tr. 57).  Plaintiff testified that his pain is the same whether he is walking on flat ground or an incline.  (Id.).

Plaintiff stated that he was stilling seeing Dr. Richard White, who performed the knee surgery.  (Id.).  Plaintiff testified that Dr. White would determine whether any additional treatment was necessary at his next visit.  (Id.).  Plaintiff stated that he participated in therapy for about six weeks following his surgery.  (Id.).

Plaintiff testified that he experiences a sharp pain between the middle and the lower part of his back.  (Id.).  Plaintiff stated that he sees a chiropractor for his back pain, which has helped.  (Id.).  Plaintiff testified that his back pain was constant, although the severity varied depending on his level of activity.  (Tr. 58).  Plaintiff stated that his typical level of pain is mild, but if he moves around, it becomes severe.  (Id.).

Plaintiff testified that driving long distances, such as the drive from Poplar Bluff to St. Louis, increases his pain.  (Id.).  Plaintiff stated that he traveled an hour-and-a-half to the hearing, and that his wife drove most of the way.  (Id.).  Plaintiff testified that performing yard work also

increases his back pain. (Id.).

Plaintiff stated that he was no longer able to work on his vehicles due to the bending, reaching, and stretching involved. (Id.). Plaintiff testified that he experiences back and shoulder pain when he tries to reach, stretch, and twist. (Id.).

Plaintiff stated that vacuuming is the household chore that increases his symptoms the most. (Id.). Plaintiff testified that he does not wash dishes or cook because he is unable to stand long enough. (Id.).

Plaintiff stated that he was able to walk for about thirty minutes before his back started to hurt. (Tr. 60). Plaintiff testified that he has to stop to rest about half-way through the shopping trip when he shops with his wife. (Id.).

Plaintiff stated that standing still also hurts his back. (Id.). Plaintiff testified that he was able to stand for about ten minutes before he has to change positions. (Id.).

Plaintiff stated that he tried swimming not long before the hearing, and it really irritated his shoulder. (Id.).

Plaintiff testified that his doctors were not recommending any additional treatment for his back problem. (Id.).

Plaintiff stated that his pain medication eased his back pain "quite a bit." (Tr. 61). Plaintiff testified that his pain medication caused him to experience some difficulty concentrating. (Id.). Plaintiff stated that he forgets what he planned to say when he has conversations. (Id.). Plaintiff testified that he also has difficulty concentrating when he tries to play computer games. (Id.). Plaintiff stated that he is able to play computer games for about one hour when he is sitting in his recliner with his feet propped. (Id.).

Plaintiff testified that he is able to sit upright for fifteen to twenty minutes. (Id.). Plaintiff stated that he has to get up and move around within thirty minutes. (Id.).

Plaintiff stated that sitting in a recliner with his feet propped is his most comfortable position. (Tr. 62). Plaintiff testified that he spends about three quarters of his day in this position. (Id.). Plaintiff stated that on days during which he is unable to sit in his recliner because he has to attend doctor appointments or hearings, he experiences severe shoulder and back pain and sits in his recliner with his feet propped the whole next day. (Id.).

Plaintiff testified that he has difficulty sleeping at night because he cannot get comfortable lying in bed. (Id.). Plaintiff stated that he takes medication to help him sleep, which is effective. (Id.). Plaintiff testified that he is able to sleep at least six hours when he takes medication, and he has no side effects the next day. (Tr. 63).

Plaintiff stated that he was still seeing Dr. Haiderzad, a psychiatrist, who prescribes medication for his depression. (Tr. 63). Plaintiff testified that he experiences symptoms with the medication. (Id.). Plaintiff stated that he occasionally does not want to be around people, occasionally sleeps all day, and no longer participates in any activities. (Id.). Plaintiff testified that he does not see a counselor. (Tr. 64).

Plaintiff stated that he lives with his wife, his oldest daughter, and his daughter's three children. (Id.). Plaintiff testified that his grandchildren are aged nine, seven, and three. (Id.). Plaintiff stated that he occasionally participates in activities with the children. (Id.). Plaintiff testified that he occasionally watches the children when they are playing outside. (Id.). Plaintiff stated that his wife was laid off four months prior to the hearing, and she was drawing unemployment benefits. (Id.).

Plaintiff testified that his workers' compensation claim was resolved. (Tr. 65). Plaintiff stated that he received a cash settlement of approximately $51,000.00. (Id.).

Plaintiff testified that he does not receive Medicare benefits. (Id.). Plaintiff stated that his Medicaid benefits expired and he has reapplied for benefits. (Id.).

When asked whether he would be able to perform a light job that involved mostly sitting, plaintiff stated that he could "maybe" perform such a position if he could prop his feet. (Tr. 66). Plaintiff stated that he would be unable to sit for long periods and his concentration was not good. (Id.).

## C.  **Relevant Medical Records**

The record reveals that plaintiff underwent right shoulder arthroscopic surgery in April 2004 performed by William Thorpe, M.D. for instability and partial rotator cuff tears with impingement.[5] (Tr. 351-53). In May 2004, plaintiff underwent left shoulder arthroscopic surgery for instability and partial rotator cuff tears with impingement. (Tr. 355-57). Plaintiff participated in physical therapy following surgery. (Tr. 359).

On October 25, 2004, Dr. Thorpe indicated that plaintiff's right shoulder had done well, but his left shoulder continued to be painful. (Tr. 360). Upon examination, plaintiff had pain with range of motion, but no signs of instability. (Id.). Dr. Thorpe found that, given the chronic nature of his problem and the fact that he had surgery on both shoulders, he should be disabled from his work. (Id.). Dr. Thorpe found that plaintiff had permanent restrictions of no overhead

---

[5]Shoulder impingement syndrome is a common cause of shoulder pain, which occurs when there is impingement of tendons or bursa in the shoulder from bones of the shoulder. Overhead activity of the shoulder, especially repeated activity, is a risk factor for shoulder impingement syndrome. Stedman's at 1915.

lifting and no lifting over twenty pounds. (Id.).

Plaintiff saw orthopedist James P. Emanuel, M.D. for an independent medical evaluation of his shoulders on February 10, 2005. (Tr. 386). Dr. Emanuel expressed the opinion that plaintiff was not permanently disabled and that he was a candidate for a repeat arthroscopy of the shoulders. (Tr. 385). On June 22, 2005, plaintiff underwent left shoulder arthroscopy. (Tr. 382). On September 12, 2005, Dr. Emanuel found that plaintiff's left shoulder was doing well. (Tr. 378). Plaintiff had full range of motion of the left shoulder. (Id.). Dr. Emanuel found that plaintiff had reached maximum medical improvement, and released plaintiff to full duty without restrictions. (Id.). Dr. Emanuel recommended arthroscopy of the right shoulder. (Id.).

Plaintiff underwent arthroscopy of the right shoulder on September 16, 2005. (Tr. 377).

On November 28, 2005, Dr. Emanuel noted that plaintiff had participated in physical therapy and work hardening and was doing well but still had complaints of pain. (Tr. 373). Dr. Emanuel diagnosed plaintiff with bursitis[6] with impingement, and acromioclavicular joint[7] arthritis. (Id.). Dr. Emanuel found that plaintiff was at maximum medical improvement, and stated that his subjective complaints did not match his physical exam or objective findings at the time of surgery. (Id.). Dr. Emanuel expressed the opinion that plaintiff was capable of full duty work without restrictions. (Id.).

Plaintiff received chiropractic care for complaints of pain in his shoulder, neck, and knee from April 2006 through October 2006. (Tr. 394-98).

---

[6]Inflammation of a bursa, which is a fluid-filled sac that acts as a cushion between muscles, tendons, and joints. See Stedman's at 280.

[7]The joint at the top of the shoulder, which is the junction between the acromion and the clavicle. Stedman's at 1012.

Plaintiff presented to D.L. Davis at Advanced Healthcare on September 6, 2006, with complaints of shoulder pain due to having to use crutches for left knee pain. (Tr. 387). Dr. Davis prescribed Percocet[8] and was advised to monitor his activity and stay active. (Id.).

Plaintiff saw April Piland, FNP, on December 21, 2006, for evaluation of his shoulder, back, and knee complaints. (Tr. 399). Ms. Piland indicated that plaintiff had injured his knee in a four-wheeler accident and had undergone surgery. (Id.). Upon physical examination, plaintiff had significant upper extremity weakness bilaterally, but no lower extremity weakness. (Tr. 400). Plaintiff had limited range of motion of the shoulders. (Id.). Plaintiff had some difficulty with heel-toe walking due to balance, and mild difficulty getting on and off the exam table. (Id.). Plaintiff was not using any assistive device for ambulation. (Id.). Ms. Piland noted that plaintiff had no significant difficulty sitting, standing, or walking. (Id.). Plaintiff was unable to lift anything up above his head and had limited ability carrying anything greater than ten pounds due to diminished strength in the upper extremity. (Id.). Plaintiff was able to drive. (Id.). Finally, Ms. Piland noted that plaintiff had significant pain in his knees when he bends and puts weight on them to get up and down and gets in and out of a chair. (Id.).

Plaintiff received chiropractic treatment for complaints of neck and back pain from February 2007 through November 2007. (Tr. 428).

Plaintiff presented to orthopedic surgeon Bruce Schlafly, M.D. on June 5, 2007, with complaints of bilateral shoulder pain, chronic low back pain, and left knee pain. (Tr. 406). Upon examination, plaintiff walked with a mild limp, favoring his left knee. (Tr. 408). Plaintiff was able

---

[8]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1127.

to walk on his toes and heels, and squat down and rise up.  (Id.).  Dr. Schlafly noted some

swelling of the left knee, and tenderness to palpation over the lower lumbar spine.  (Tr. 409).

Plaintiff had good range of motion of the hips, knees, and ankles.  (Id.).  Plaintiff had seventy-five

percent of the normal active forward flexion and lateral flexion of the lumbar spine, with normal

extension.  (Id.).  Plaintiff had seventy-five percent of the normal range of motion of the cervical

spine.  (Id.).  Plaintiff had some limitation of range of motion of the shoulders, with 4/5 strength,

and no ligamentous instability.  (Id.).  Dr. Schlafly found that plaintiff's work injury resulted in a

ten percent permanent partial disability of the body as a whole referable to the low back.  (Tr.

410).  Dr. Schlafly stated that plaintiff had significant problems in the left lower extremity

referable to his left knee, which related to a separate trauma that occurred following his

employment.  (Id.).  Dr. Schlafly found that plaintiff's repetitive overhead work caused his

shoulder injuries, and that he had forty-five percent permanent partial disability of the left shoulder

and forty percent permanent partial disability of the right shoulder.  (Id.).  Dr. Schlafly expressed

the opinion that plaintiff was "no longer fit for employment repairing trucks," and that he can no

longer perform overhead work with his arms.  (Id.).  Dr. Schlafly also recommended no lifting

greater than twenty pounds using both hands and arms.  (Id.).

Plaintiff presented to Dr. Davis on June 25, 2007, with complaints of back and bilateral

shoulder pain.  (Tr. 412).  Upon examination, plaintiff's gait was normal.  (Id.).  Dr. Davis

prescribed Darvocet,[9] and advised plaintiff to monitor his diet closely and stay active.  (Id.).

Plaintiff presented to Philma B. Opinaldo, M.D. on September 27, 2007, with complaints

of depression.  (Tr. 416).  Plaintiff reported that he had been depressed for more than one year.

---

[9]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 3289.

(Id.).  Plaintiff was irritable and moody but denied suicidal thoughts.  (Id.).  Plaintiff also

complained of bilateral shoulder pain.  (Id.).  Upon examination, plaintiff had tenderness on

palpation of the acromioclavicular joints of both shoulders and decreased range of motion of the

shoulders.  (Id.).  Dr. Opinaldo diagnosed plaintiff with generalized osteoarthritis[10] of multiple

sites and seasonal pattern depression.  (Id.).  Dr. Opinaldo prescribed Paxil.[11]  (Tr. 418).

Plaintiff saw Wayne A. Stillings, M.D. on October 1, 2007, for a psychiatric examination.

(Tr. 419-27).  Upon examination, plaintiff's affect was somewhat listless, mood was very

clinically depressed, concentration was poor, cognitive functions were impaired by his depressive

process, verbal comprehension was fair, general fund of knowledge was adequate, and his proverb

interpretation was appropriate.  (Tr. 426).  Dr. Stillings found that plaintiff's intellectual ability

was in the normal range.  (Id.).  Plaintiff lacked self-insight and his judgment was intact.  (Id.).

Plaintiff was irritable, depressed, and was unable to do the physical things that he used to do.

(Id.).  Dr. Stillings administered the Wide-Range Achievement Test ("WRAT-3"), which revealed

performance at the fourth grade level in reading, spelling, and arithmetic.  (Id.).  Dr. Stillings

diagnosed plaintiff with mood disorder[12] with major depressive-like episode due to a general

medical condition; pain disorder associated with both psychological factors and a general medical

---

[10]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

[11]Paxil is an antidepressant indicated for the treatment of major depressive disorder, panic disorder, and generalized anxiety disorder.  See PDR at 1536-37.

[12]A group of mental disorders involving a disturbance of mood, accompanied by either a full or partial manic or depressive syndrome that is not due to any other mental disorder. Stedman's at 569.

condition; learning disabled with disabilities in reading, written expression, and mathematics; and a GAF[13] score of 52.[14] (Tr. 426-27).

Plaintiff saw Raymond F. Cohen, D.O. for an evaluation on November 12, 2007. (Tr. 1598-1607). Upon physical examination, plaintiff's gait, sensory, and coordination were all intact. (Tr. 1603). Dr. Cohen noted tenderness over the cervical and lumbar spine. (Tr. 1604). Plaintiff had full range of motion in all directions of the lumbar spine, although he complained of pain. (Id.). Straight leg raising was positive with the complaint of low back pain at seventy degrees bilaterally. (Id.). Plaintiff was tender to palpation over the right shoulder. (Id.). A distinct pop was heard with range of motion testing, and plaintiff had limited range of motion. (Id.). Plaintiff had limited range of motion of the left shoulder, positive impingement sign, and some crepitus[15] was noted with range of motion testing. (Id.). Dr. Cohen recommended that plaintiff undergo an MRI of the lumbar spine. (Tr. 1606). Dr. Cohen found that plaintiff was restricted from any activity in which he does any prolonged sitting or standing greater than thirty minutes; no repetitive bending; no stooping, twisting, squatting, or kneeling; no ladder work, climbing, or walking on uneven surfaces; no overhead use of his arms; no pushing, pulling,

---

[13]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[14]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[15]Noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis. Stedman's at 457.

repetitive use of the upper extremities; no forceful pushing or pulling; and no lifting greater than ten pounds except with the arms close to the body. (Id.). Dr. Cohen expressed the opinion that plaintiff was not capable of gainful employment. (Tr. 1607).

Plaintiff presented to Talia Haiderzad, M.D. for a psychiatric evaluation on December 19, 2007. (Tr. 438-40). Plaintiff reported feeling depressed. (Tr. 438). Plaintiff noted that his mother passed away three months prior and his daughter got divorced two months prior. (Id.). Plaintiff reported symptoms of sleep disturbance, decreased energy level, difficulty concentrating, feelings of hopelessness, helplessness, worthlessness, guilt, and anhedonia. (Id.). Upon examination, plaintiff's gait was normal, affect was restricted, attention and concentration were fair, intellect seemed average, memory was intact, and insight and judgment were fair. (Id.). Plaintiff denied suicidal thoughts but admitted to feeling suicidal "a little bit." (Id.). Dr. Haiderzad diagnosed plaintiff with major depressive disorder,[16] rule out dysthymic disorder,[17] and assessed a GAF score of 55. (Tr. 440). Dr. Haiderzad prescribed Prozac[18] and Trazodone.[19] (Id.).

On January 30, 2008, plaintiff saw Dr. Haiderzad for follow-up, at which time plaintiff's affect was neutral, thought processes were goal directed, attention and concentration were intact,

---

[16]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[17]A chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. Stedman's at 569.

[18]Prozac is indicated for the treatment of major depressive disorder. See PDR at 1854.

[19]Trazodone is an antidepressant indicate for the treatment of depression. See WebMD, http://www.webmd.com/drugs (last visited January 10, 2013).

memory was intact, insight was good, and his judgment was good. (Tr. 441). Dr. Haiderzad diagnosed plaintiff with major depressive disorder with a GAF score of 55. (Id.). Dr. Haiderzad discontinued the Prozac due to plaintiff's complaints of side effects, and prescribed Celexa.[20] (Id.).

Plaintiff saw Mary Titterington, Vocational Rehabilitation Consultant, on February 16, 2008, for a vocational evaluation at the request of his attorney. (Tr. 1008-1017). Ms. Titterington stated that plaintiff's overall presentation was that of someone whose mental processing was slow. (Tr. 1008). Ms. Titterington performed intelligence testing, which revealed a Verbal IQ of 79, Visual IQ of 79, and General IQ of 76, which placed him in the borderline range of intellectual functioning.[21] (Tr. 1014). Ms. Titterington expressed the opinion that plaintiff was unemployable in the open labor market due to the impairments to his intellectual, physical, and emotional functioning. (Tr. 1017).

On March 19, 2008, plaintiff reported that he was not doing very well, he felt depressed, and did not want to be around people. (Tr. 442). Dr. Haiderzad indicated that plaintiff's insight was fair, and his judgment was fair to poor. (Id.). Dr. Haiderzad discontinued the Celexa and started plaintiff on Cymbalta.[22] (Id.).

Plaintiff saw Dr. Davis for follow-up regarding his shoulder pain on March 31, 2008. (Tr. 449). Plaintiff also complained of difficulty sleeping. (Id.). Upon examination, Dr. Davis noted

---

[20]Celexa is an antidepressant indicated for the treatment of depression. See PDR at 1160.

[21]Borderline intellectual functioning is defined as an IQ in the 71-84 range, while mental retardation is defined as an IQ of 70 or below. See DSM-IV at 684.

[22]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1801.

tenderness and very limited range of motion of the bilateral shoulders. (Id.). Dr. Davis diagnosed

plaintiff with bilateral shoulder pain and insomnia. (Id.). He prescribed Flexeril,[23] Tramadol, and

Darvocet, and recommended that plaintiff monitor his diet closely and stay active. (Id.).


On April 28, 2008, plaintiff reported that he was doing better. (Tr. 1717). Plaintiff

described his mood as "pretty good." (Id.). Plaintiff's attention, concentration, and memory were

intact, and his insight and judgment were good. (Id.). Dr. Haiderzad diagnosed plaintiff with

major depressive disorder, with a GAF score of 55. (Id.). Dr. Haiderzad found that plaintiff

seemed stable on his medications. (Id.). On June 11, 2008, plaintiff reported that he was doing

"pretty good." (Tr. 1718). On November 3, 2008, plaintiff reported that he was not doing good.

(Tr. 1719). Plaintiff indicated that he had stopped taking Cymbalta because it made him shaky

and nervous. (Id.). Plaintiff's insight and judgment were described as fair. (Id.). Dr. Haiderzad

adjusted plaintiff's medication. (Id.). On December 29, 2008, plaintiff complained that he was

not sleeping well because he experienced significant pain and was unable to obtain pain

medication from his doctor. (Tr. 1720). Plaintiff's insight and judgment were good. (Id.). Dr.

Haiderzad increased plaintiff's evening dosage of Trazodone. (Id.).

Tina Moe, FNP, completed a Medical Report Including Physician's Certification/Disability

Evaluation on January 7, 2009. (Tr. 1493-94). Upon examination, Ms. Moe noted only mild

limitations to the cervical spine and shoulders. (Tr. 1494). Plaintiff had very minimal limitations

to the lumbar area. (Id.). Ms. Moe found that plaintiff was capable of functioning in the

---

[23]Flexeril is indicated for the relief of muscle spasm associated with acute, painful
musculoskeletal conditions. See PDR at 1931.

workforce at some type of vocation, and that he would probably benefit from vocational rehab. (Id.).

Plaintiff saw James M. England, Jr., Vocational Rehabilitation Counselor, for a Vocational Rehabilitation Evaluation on January 12, 2009. (Tr. 978-90). Mr. England summarized the medical evidence and noted that, even the restrictions indicated by Dr. Cohen would still allow for a variety of entry-level sedentary to light service-type employment. (Tr. 990). Mr. England noted that he had not seen any specific psychiatric restrictions in the record, and that the GAF scores in the record were in the moderate range but not the severe range. (Id.). Mr. England stated that plaintiff has demonstrated in the past that he is capable of learning by observing and has performed semi-skilled work activity in a variety of settings. (Id.). Mr. England recommended vocational rehab. (Id.). He stated that the "medical evidence would not lead me to believe that he is totally unable to work, but rather might need to change careers depending on the medical evidence accepted as valid." (Id.).

Plaintiff presented to the emergency room at Poplar Bluff Regional Medical Center on February 18, 2009, with complaints of major depression, and thoughts of suicide, with no gesture or plan. (Tr. 1639). Plaintiff reported feeling hopeless, worthless, and noted significant financial issues. (Id.). Plaintiff indicated that his depression became worse when he kicked his nineteen-year-old son out of the house. (Tr. 1640). Plaintiff was admitted and was placed on suicide precautions. (Id.). Plaintiff later reported that he felt good. (Id.). He was discharged on February 21, 2009. (Id.). Plaintiff's discharge diagnosis was major depressive disorder, with a

GAF score of 40.[24]  (Tr. 1641).  Plaintiff was prescribed Naproxen, Trazodone, Cymbalta, and Tylenol.  (Id.).

Plaintiff underwent x-rays of the left knee on March 24, 2009, which revealed mild osteoarthritis.  (Tr. 1546).  Plaintiff underwent x-rays of the thoracic spine on May 28, 2009, which revealed mild degenerative arthritis.  (Tr. 1545).  X-rays of the lumbar spine revealed slight scoliosis.[25]  (Tr. 1544).  Plaintiff underwent an MRI of the thoracic spine on June 15, 2009, which showed degenerative disc disease[26] with no significant bulging or herniated discs.  (Tr. 1547).

Plaintiff saw Dr. Haiderzad on April 22, 2009, at which time he reported that he was doing "pretty good."  (Tr. 1721).  Plaintiff's affect was euthymic.[27]  (Id.).  Plaintiff's insight and judgment were described as fair to good.  (Id.).  Dr. Haiderzad adjusted plaintiff's medications.  (Id.).

Plaintiff saw Michael R. Jarvis, M.D., Ph.D., Director of Inpatient Psychiatry at Washington University School of Medicine, on June 8, 2009, for an independent psychiatric examination upon the request of his attorney.  (Tr. 991-1006).  Upon examination, plaintiff's affect was reactive, appropriate, and euthymic; his thought was logical.  (Tr. 1004).  Plaintiff

---

[24]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work...)."  DSM-IV at 32.

[25]Abnormal lateral and rotational curvature of the vertebral column.  Stedman's at 1734.

[26]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

[27]Moderation of mood; not manic or depressed.  Stedman's at 678.

described his mood as five out of ten.  (Id.).  Plaintiff was without suicidal or homicidal ideation

intent or plan.  (Id.).  Dr. Jarvis diagnosed plaintiff with adjustment disorder[28] with depressed

mood; borderline intellectual functioning; and a GAF score of 60 to 70.[29]  (Tr. 1005).  Dr. Jarvis

stated that plaintiff was able to previously work with his mental and intellectual state and

therefore should not be restricted from a psychological point of view from working.  (Tr. 1006).

On June 19, 2009, plaintiff saw Yuli Soeter, M.D., upon the referral of Dr. Davis, for

treatment of his back pain.  (Tr. 1539).  Upon examination, plaintiff had spine pain with palpation,

but no sacroiliac joint tenderness.  (Tr. 1540).  Plaintiff had full range of motion of the bilateral

hips, and ambulated independently without antalgic[30] gait.  (Id.).  Plaintiff had full motor strength

in the lower extremity and in both knees, and his sensory examination was normal.  (Id.).  Dr.

Soeter diagnosed plaintiff with thoracic spine intervertebral disc degeneration, and lumbar and

thoracic spine scoliosis.  (Id.).  Dr. Soeter recommended trigger point injections to control muscle

spasms, and advised plaintiff to continue to take anti-inflammatory medications.  (Tr. 1541).  Dr.

Soeter administered a trigger point injection.  (Id.).  On July 10, 2009, plaintiff reported that the

trigger point injections did not provide adequate relief.  (Tr. 1537).  Dr. Soeter prescribed a

Lidoderm patch, and recommended that plaintiff do stretching exercises.  (Tr. 1538).  On July 24,

---

[28]A disorder the essential feature of which is a maladaptive reaction to an identifiable psychological stress or stressors.  Stedman's at 567.

[29]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.  A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Id.

[30]A gait abnormality adopted to minimize pain.  See Stedman's at 71.

2009, plaintiff reported that the Lidoderm patch provided significant pain relief. (Tr. 1535). On September 4, 2009, plaintiff stated that the Lidoderm patch helped reduce his pain where he can function more. (Tr. 1533). Upon examination, plaintiff ambulated on his own and appeared comfortable. (Tr. 1533). On October 2, 2009, plaintiff reported that he was doing well with the Lidoderm patch, but complained of severe bilateral shoulder pain. (Tr. 1530). Upon examination, Dr. Soeter noted tenderness and limited range of motion of the bilateral shoulders. (Id.). X-rays of the bilateral shoulders revealed mild bilateral degenerative arthritis. (Tr. 1543). Dr. Soeter administered an injection for plaintiff's bilateral shoulder subacromial bursitis. (Tr. 1531). On October 16, 2009, Dr. Soeter noted that plaintiff responded to the shoulder injection but still had significant residual pain. (Tr. 1528). Dr. Soeter indicated that plaintiff had limited range of motion of the shoulders. (Id.). He recommended an exercise regimen of both shoulders. (Id.).

Plaintiff saw Dr. Haiderzad on July 21, 2009, at which time he reported that he was not doing well. (Tr. 1722). Plaintiff indicated that he had been getting angry lately, and described problems he was having with his son. (Id.). Plaintiff's diagnosis was changed to mood disorder NOS. (Id.). Plaintiff's medications were adjusted. (Id.). On September 10, 2009, plaintiff reported that he was doing "pretty good." (Tr. 1723). Plaintiff's insight and judgment were good. (Id.). Plaintiff was diagnosed with mood disorder NOS, major depressive disorder. (Id.).

Plaintiff presented to Richard A. White, M.D. on October 26, 2009, with complaints of left knee pain and instability. (Tr. 1873). Dr. White diagnosed plaintiff with left knee anterior cruciate ligament[31] tear and recommended surgery. (Tr. 1874).

---

[31]One of the four major ligaments of the knee. See Stedman's at 1081.

On October 30, 2009, Dr. Soeter continued plaintiff on the Lidoderm patch. (Id.).

Plaintiff saw Dr. Haiderzad on November 4, 2009, at which time he reported that he was a bit aggravated because he had no income. (Tr. 1724). Plaintiff' insight and judgment were good. (Id.). Plaintiff's medications were adjusted. (Id.). Dr. Haiderzad stated that plaintiff seemed to be stable. (Id.).

On November 24, 2009, Dr. White performed a left knee arthroscopy with anterior cruciate ligament reconstruction, posterior horn medial meniscus tear repair and debridement, and synovectomy.[32] (Tr. 1876).

On December 4, 2009, Dr. Soeter administered a bilateral shoulder injection. (Tr. 1524).

Plaintiff saw Dr. Haiderzad on December 14, 2009, at which time he reported that he was doing "pretty good." (Tr. 1725). Plaintiff complained of memory problems. (Id.). Plaintiff's insight and judgment were fair to good. (Id.). Dr. Haiderzad stated that plaintiff seemed to be stable on his medication regimen. (Id.). He recommended that plaintiff see his primary care provider if his memory difficulties worsened. (Id.). On February 8, 2010, plaintiff reported that he was doing "pretty good," and that he felt his medications were helping. (Tr. 1727). His insight and judgment were good. (Id.). Dr. Haiderzad stated that plaintiff seemed to be stable and that he tolerated his medications with no visible side effects. (Id.).

Steven Akeson, Psy.D. completed a Psychiatric Review Technique on February 18, 2010. (Tr. 1586-97). Dr. Akeson expressed the opinion that plaintiff's depression was not severe and resulted in only mild limitations in plaintiff's ability to maintain social functioning and ability to maintain concentration, persistence, or pace. (Tr. 1594).

---

[32]Excision of a portion or all of the synovial membrane of a joint. Stedman's at 1920.

Plaintiff presented to Dr. Haiderzad on May 4, 2010, at which time he reported that he was doing "pretty good," and that his medications seemed to be working. (Tr. 1767). Dr. Haiderzad stated that plaintiff seemed to be stable and that he was tolerating his medications with no visible side effects. (Id.). On July 20, 2010, plaintiff continued to report that he was doing "pretty good." (Tr. 1768).

## The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 30, 2011.

2.   The claimant has not engaged in substantial gainful activity since August 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: degenerative joint disease of the bilateral shoulders, left knee, cervical, thoracic, and lumbar spine; bilateral shoulder bursitis; residuals of status post left knee anterior cruciate ligament tear with arthroscopic surgical repair; major depressive disorder; mood disorder; and borderline intellectual functioning (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments (20 CFR Part 404, Subpart P, Appendix 1, Part A) (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; reaching overhead more than occasionally; and performing more than simple work.

6.   The claimant is capable of performing past relevant work as a progressive assembler and fitter. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2005, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 20-25).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on October 11, 2006, the claimant is not disabled (Social Security Act, sections 216(I) and 223(d)).

(Tr. 20).

## Discussion
A.     **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. <u>See</u> <u>Ostronski v. Chater</u>, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. <u>See</u> <u>Roberts v. Apfel</u>, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. <u>See</u> <u>Kelley v. Callahan</u>, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. <u>See</u> <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. <u>See</u> <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." <u>Id.</u>

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in failing to follow the remand order of the Appeals Council.  Plaintiff next argues that the ALJ erred in not requiring the vocational expert to answer all of the questions propounded in his interrogatories.  Plaintiff finally argues that the ALJ erred in evaluating the opinion of Dr. Schlafly.  The undersigned will address plaintiff's claims in turn.

## 1.    Appeals Council's Remand Order

In the remand order, the Appeals Council notes that the ALJ's decision indicates that plaintiff has medically determinable impairments resulting in significant exertional and nonexertional limitations in overhead reaching and work involving more than simple instructions. (Tr. 87).  The order points out that there is no vocational evidence in the record regarding the extent to which plaintiff's limitations erode the occupational base for a reduced range of light work.  The remand order directs the ALJ to take the following action:

> Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14), and to determine whether the claimant has acquired any skills that are transferable to other occupations under the guidelines in Social Security Ruling 82-41.  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.  The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566).  Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 11-4p).

(Tr. 87).

Upon remand, the ALJ propounded interrogatories to vocational expert J. Stephen Dolan, which Mr. Dolan answered on November 11, 2010.  (Tr. 318-20, 325-26).  In response to question 11, Mr. Dolan found that an individual of plaintiff's age, with plaintiff's education, work

history, and limitations found by the ALJ would be capable of performing plaintiff's past work as a progressive assembler and fitter.  (Tr. 326).

Plaintiff first argues that the ALJ failed to follow the remand order in that the vocational expert did not provide answers to questions 12 and 13.  Plaintiff also contends that, in failing to require complete answers, the ALJ did not fulfill his duty to fully develop the record.  Question 12 asked whether plaintiff had any transferable skills to other work.  (Tr. 320).  Question 13 states, in relevant part, "*If you determine that the claimant is not qualified to perform any past relevant work*, please identify all other jobs the claimant could perform, based on the same assumptions." (Tr. 320) (emphasis added).

If a claimant has the residual functional capacity to perform past relevant work, the inquiry ends and benefits are denied.  <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The vocational expert found that plaintiff was capable of performing his past relevant work as a progressive assembler and fitter.  (Tr. 326).  Thus, he was not required to answer the subsequent questions regarding other work plaintiff was capable of performing.  In fact, the plain language of question 13 indicates that it only applies if the vocational expert determines that plaintiff was not capable of performing any past relevant work.  (Tr. 320).  The vocational expert was not required to answer question 12 or 13, and the ALJ did not err in failing to obtain responses to these questions.

Plaintiff next argues that the ALJ did not follow the instruction of the Appeals Council to resolve any conflict between the occupational evidence provided by the vocational expert and information in the DOT and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 11-4p).  (Tr. 87).  Plaintiff is presumably referring to the fact that Mr. Dolan indicated that plaintiff's past work as a progressive assembler and fitter is

described as semi-skilled in the DOT. (Tr. 326). Mr. Dolan stated that, although this position is described in the DOT as semi-skilled, it has a SVP of 3 and is "very simple once a person knows how to do it." (Id.). The ALJ acknowledged this inconsistency in his opinion, and pointed to Mr. Dolan's testimony that the position was very simple once a person knows how to do it. (Tr. 25). The ALJ concluded that plaintiff was capable of performing this position as actually performed. (Id.).

The undersigned finds that the ALJ adequately followed the directives of the remand order. An ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT, unless there is evidence in the record to rebut those classifications. Hillier v. Soc. Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). The ALJ addressed the inconsistency between Mr. Dolan's testimony and the DOT. The ALJ relied on the testimony of the vocational expert that, although this position was classified as semi-skilled, it was simple once a person knew how to perform it. In Hillier, the Eighth Circuit held that the claimant's past work as a cashier, in the absence of any evidence of mental deterioration, constituted substantial evidence to support a finding that the claimant could work as a cashier despite the fact that the work exceeded the claimant's skill level according to the DOT. 486 F.3d at 367. Similarly, in this case, plaintiff has demonstrated an ability to work as a progressive assembler and fitter despite the DOT's classification of the position as semi-skilled. There is no evidence in the record of mental deterioration that would preclude plaintiff from performing this work. Thus, the ALJ's finding that plaintiff was capable of performing this position is supported by substantial evidence.

**2.     Medical Opinion Evidence**

Plaintiff argues that the ALJ erred in evaluating the opinion of Dr. Schlafly. Specifically, plaintiff contends that the ALJ assigned significant weight to the opinion of Dr. Schlafly that

plaintiff was limited to light work, yet rejected Dr. Schlafly's finding that plaintiff was no longer fit for employment repairing trucks.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

Dr. Schlafly, an orthopedist, examined plaintiff on June 5, 2007. (Tr. 405-11). As plaintiff notes, Dr. Schlafly found that plaintiff could lift no more than twenty pounds. (Tr. 410). Dr. Schlafly also expressed the opinion that plaintiff was "no longer fit for employment repairing trucks." (Id.). Dr. Schlafly was referring to plaintiff's position at Penske Truck Leasing Company, at which plaintiff performed maintenance and repairs on trucks and did "a lot of heavy lifting." (Tr. 405).

Contrary to plaintiff's argument, the ALJ did not find that plaintiff was capable of performing his past work repairing trucks. Rather, the ALJ found that plaintiff could perform his past relevant work as a progressive assembler and fitter, which was light in exertion. (Tr. 25). Thus, the ALJ's finding is consistent with Dr. Schlafly's opinion, and the ALJ did not err in evaluating this evidence.

Plaintiff also appears to challenge the ALJ's RFC determination, as he argues that the hypothetical question posed to the vocational expert did not include a restriction of lifting no more than ten pounds, as well as other postural restrictions as set forth in plaintiff's attorney's hypothetical to the vocational expert. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

The RFC determined by the ALJ is supported by the medical opinion evidence. Dr. Emanuel, plaintiff's treating orthopedic surgeon, expressed the opinion that plaintiff was capable of full duty work without restrictions on November 28, 2005. (Tr. 373). As previously discussed, consulting orthopedist Dr. Schlafly found that plaintiff could lift up to twenty pounds. (Tr. 410). Nurse practitioner Tina Moe found that plaintiff had only mild limitations to the cervical spine, shoulders, and lumbar area, and expressed the opinion that plaintiff was capable of functioning in the workplace at some type of vocation. (Tr. 1494). Finally, vocational

rehabilitation counselor James England found that the medical evidence did not support a finding of disability.  (Tr. 990).

The objective medical evidence also supports the ALJ's determination.  As the ALJ noted, there is no evidence of significant joint or spine abnormality or range of motion limitations.  (Tr. 23).  In addition, there is no objective evidence of muscle atrophy, spasm, or weakness, neurological deficits or inflammatory signs.  (Id.).  Imaging revealed only mild degenerative arthritis of the left knee and mild degenerative joint disease of the thoracic spine, with no significant bulging or herniated discs.  (Tr. 1545-47).

With regard to plaintiff's mental impairments, the ALJ indicated that he was assigning great weight to the opinion of plaintiff's treating psychiatrist, Dr. Haiderzad, who indicated in substance moderate mental functional limitations.  (Tr. 24).  The ALJ noted that consulting psychiatrist Dr. Jarvis and non-examining state agency psychologist Dr. Akeson found no significant mental functional limitations.  (Tr. 1005-06, 1594).  The ALJ, however, indicated that he was assigning less weight to these opinions because they did not have a treating relationship with plaintiff.  (Tr. 24).  The ALJ concluded that plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, which restrict plaintiff to no more than simple work activity.

The ALJ's determination is supported by substantial evidence.  The ALJ's finding is supported by the treatment notes of Dr. Haiderzad, who treated plaintiff regularly for diagnoses of major depressive disorder and mood disorder-NOS, and assigned GAF scores indicating moderate limitations.  (Tr. 440, 441, 1717, 1718, 1719, 1720, 1721, 1723, 1724, 1725, 1727, 1767, 1768).  Dr. Haiderzad prescribed and adjusted medications for plaintiff's impairments.  (Id.).  In her most recent treatment notes, Dr. Haiderzad noted that plaintiff seemed to be stable

and was tolerating his medications with no visible side effects.  (Tr. 1724, 1727, 1767).  Plaintiff does not appear to dispute the ALJ's determination that plaintiff was restricted to simple work activity as a result of his mental impairments.

## Conclusion

In sum, the undersigned finds that substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  31st  day of January, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE